IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| BRENDA ATUTONU KING, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 6:18-CV-03319-MDH ) |
| WYNDHAM VACATION RESORTS, INC., et al., | ) ) ) |
| Defendants. | ) ) |

## ORDER

Before the Court is Defendant Wyndham Vacation Resort's Motion for Summary Judgment on Breach of Contract Counterclaims. (Doc. 84). Defendant filed a breach of contract counterclaim against plaintiffs Thomas Kohlbeck, Gay Hartfiel, Roger Leake, and Rita Leake. (Doc. 61). Wyndham claims plaintiffs breached their timeshare contracts by failing to make payment owed to Wyndham under those contracts. Plaintiffs concede they were parties to their timeshare contracts and failed to make payments under those contracts but state two affirmative defenses: (2) the contracts are invalid because they were signed under duress; and (2) the contracts should be rescinded because they were entered into as a result of Wyndham's fraudulent misrepresentations. For the reasons explained below, the Court will grant Wyndham's Motion for Summary Judgment.

## Background

**A. Gay Hartfiel and Thomas Kohlbeck**

In their complaint, Hartfiel and Kohlbeck, who are married, claimed (1) a Wyndham representative lied to them during this sales meeting by falsely representing they could "rent out

1

their points" to make money and cover maintenance fees and buy points to offset maintenance fees; (2) a Wyndham representative lied to them by telling them that if they did nor purchase the timeshare immediately, they would lose out, and thus were deprived of the opportunity to research the contract; (3) they were tricked into attending a lengthy high-pressure sales meeting that was designed to beat and wear them down so they would sign an adhesion contract; and (4) a Wyndham representative showed the couple a picture of his father to generate sympathy and exert undue influence.

Before March 19, 2019, the couple had entered into at least six other timeshare agreements with Wyndham. These agreements were entered into following high-pressure sales pitches that the couple thought were similar to their March 2019 meeting. The couple were generally happy with their timeshare agreements but were not looking to enter into any more when they traveled to a timeshare resort in Tennessee in March 2019.

On March 19, 2017, shortly after checking in to a timeshare resort in Tennessee, the couple entered into a contract with Wyndham whereby they became owners of a membership interest in a timeshare property. The purchase price of the timeshare was $181,490.00. The couple facilitated this purchase with a down payment and an installment financing arrangement, under which they were required to make monthly loan payments. The couple were also required to pay monthly maintenance fees for their property. The contract stated "owner will be in default under this agreement if owner fails to fulfill any agreement or obligation contained herein or in any of the documents or instruments referenced herein." In a different paragraph, it stated "Transfer or abandonment of the Ownership does not relieve Owner of Owner's obligations hereunder unless such transfer or abandonment of the Ownership is agreed to by the Association, Seller and/or any Holder or Co-Holder of any right to the unpaid balance due under this Agreement." The timeshare

2

contract had a rescission period giving the couple five days to withdraw after signing. In case of a default, the contract states that Wyndham "may choose, to the extent permitted by applicable law, one or more of the following remedies: (a) declare the entire unpaid balance of the Purchase Price and Processing Fee immediately due and payable, unless prohibited by law… (e) sue for the unpaid balance due hereunder."

The couple made their monthly loan payments from May 2017 to June 2018. As of September 2019, the balance remaining on the loan was $110,653.05. The couple also ceased their monthly maintenance payments in July 2018. They owe $11,460.26 in back payments for those assessments. Kohlbeck testified they only started to try to exit their timeshare agreement with Wyndham after Hartfiel was diagnosed with medical issues that prevented them from the full use of their Wyndham points. The couple do not dispute these amounts, the terms of the contract, or that they signed the contract. Instead, they assert the contract is both (1) invalid because it was entered into under duress; and (2) should be rescinded because it was entered into as a result of fraudulent misrepresentations. In support, they submitted their own deposition testimony.

Kohlbeck testified that at the long sales meeting between himself, his wife, and Wyndham representatives, they were told they had five days to research the timeshare contract; Kohlbeck testified that because they were on vacation, they did not conduct any research before or after signing the contract. At a different point, he testified that the salesperson told them the proposed contracts were only good that day or "maybe" tomorrow, and that this made them feel pressured to make a decision quickly. He testified the salespeople came at him from different angles, with some trying to make him feel guilty and others trying to beat or wear him down. He also testified that he always had the opportunity to leave the sales meeting, and that he had not entered timeshare contracts in the past in similar high-pressure sales situations.

3

When asked in deposition whether there were any misrepresentations made in the March 19, 2017, contract, Kohlbeck responded "no." He went on to say that although he believed that there were misrepresentations made by Wyndham before he signed other timeshare contracts, he could not remember what those misrepresentations were or when they were made. At no point does Kohlbeck specifically identify any misrepresentations made by Wyndham regarding his timeshare contract entered into in March 2017.

Hartfiel also gave deposition testimony. She stated that when she showed up at the timeshare property in Tennessee, a Wyndham employee at the front desk asked the couple to go to an "Owners' Meeting" where they could update their information on the Wyndham website. Upon arrival at the meeting, the couple learned it was in fact a sales presentation. Hartfiel testified she was "exhausted" and "starving" at the time. Hartfiel testified she was always able to leave the meeting and that she felt she was able to ask questions at the meeting. Hartfiel testified she was "happy with our accommodations" at the time but also "having second thoughts" about their relationship with Wyndham because of a worsening health condition. At that meeting, Hartfiel was told that someone from Wyndham would help her rent out her timeshare to earn extra points so that she could cover their maintenance fees; she later learned that was not the case, although she never actually tried to rent her property to earn extra points. At the sales meeting, a closing agent gave Hartfiel her contact information and told her to contact her with any issues post-signing; Hartfiel testified she was aware of this offer but never reached out with questions or issues. Hartfiel also testified she was given an opportunity to ask questions and review the contract before signing it. Finally, Hartfiel testified that she did not read the contract before signing it and that she generally does not read contracts before signing them. She stated there were "elements of high-

4

pressure sales" in every timeshare contract sales situation she found herself in over the years, and that the March 19, 2017 presentation was no different.

### B. Roger Leake and Rita Leake

In their complaint, Roger and Rita Leake, who are married, claimed (1) Wyndham used high-pressure sales tactics to induce their purchase of a timeshare; (2) Wyndham representatives made deceptive and false representations to induce that purchase, including that the timeshare would increase in value and that they could sell their timeshare for a profit; and (3) they were tricked into attending the lengthy high-pressure sales pitch where the timeshare purchase occurred.

On May 26, 2013, the Leakes entered into a contract with Wyndham whereby they became owners of a membership interest in a timeshare. The purchase price of the timeshare was $113,381. The Leakes facilitated this purchase with a down payment and an installment financing arrangement. The Leakes were also required to pay monthly maintenance fees. The contract stated "owner will be in default under this agreement if owner fails to fulfill any agreement or obligation contained herein or in any of the documents or instruments referenced herein." In a different paragraph, it stated "Transfer or abandonment of the Ownership does not relieve Owner of Owner's obligations hereunder unless such transfer or abandonment of the Ownership is agreed to by the Association, Seller and/or any Holder or Co-Holder of any right to the unpaid balance due under this Agreement." The timeshare contract had a rescission period, whereby the Leakes had five days to withdraw after signing it. In case of a default, the contract states that Wyndham "may choose, to the extent permitted by applicable law, one or more of the following remedies: (a) declare the entire unpaid balance of the Purchase Price and Processing Fee immediately due and payable, unless prohibited by law… (e) sue for the unpaid balance due hereunder."

The couple made their monthly loan payments from May 2013 to June 2018. As of September 2019, the balance owed on their loan is $38,547.41. The balance owed on their monthly maintenance fees is $9,952.15. The Leakes do not dispute these amounts, the terms of the contract, or that they signed the contract. Instead, they assert the contract is both (1) invalid because it was entered into under duress; and (2) should be rescinded because it was entered into as a result of fraudulent misrepresentations. In support, they submitted their own deposition testimony.

Rita Leake testified she and her husband entered into multiple timeshare contracts with Wyndham over a twelve-year period, from 2001 to 2013. She and her husband had stayed at around twenty different timeshare locations provided by Wyndham or RCI, a Wyndham affiliate. She testified that some of the accommodations were nicer than others, but one that stood for its shabbiness was Fairfield Glade, in Tennessee. The Leakes never complained to Wyndham about a reservation or their accommodations after a trip. Rita Leake testified she understood the terms of the contracts she and her husband were signing, and that they also felt they had the option to walk away from the offer made at the sales meeting.

Rita Leake testified that the misrepresentations by Wyndham that were the subject of her amended complaint were made at a 2015 presentation in Branson, Missouri, where the Leakes briefly entered into a timeshare agreement that superseded the operative 2013 agreement. The 2015 contract was rescinded by the Leakes within the allotted timeframe, and they were refunded payments related to that aborted contract. Rita Leake also testified that she felt misled by Wyndham because it was hard to book reservations around the holidays. However, she also stated she had been aware of this problem since 2005 and nonetheless continued to use Wyndham timeshares and enter into timeshare contracts for years after.

6

Roger Leake's testimony matches his wife's testimony. Leake testified at length about the May 2015 sales presentation in Branson, Missouri, although no new contract resulted from that sales presentation. Leake testified he was often confused about the contracts he signed over the years, and that he never fully read them, but also said he never asked Wyndham any questions about the terms of the contracts during or after signing. He affirmed that he understood he had the right to leave Wyndham sales presentations and did in fact leave many of those presentations over the years. He also understood his right to rescind the contracts within the allotted period after signing and testified he and his wife took advantage of that right after signing another timeshare contract in May 2015 in Branson, Missouri.

Roger Leake testified the first time he felt he was in a high-pressure sales situation was in May 2013, when he signed the contract that is the subject of Wyndham's breach of contract counterclaim. Leake complained that after checking in to their timeshare, they were directed to what was supposed to be a 30-minute owners' update but was in fact a grueling 3-hour sales presentation. Despite his sense he had been pressured into signing a new timeshare contract, Leake testified he never complained to Wyndham about that presentation or the resulting contract. After May 2013, the Leakes continued to vacation at Wyndham properties using Wyndham points. Leake testified that the accommodations at Wyndham properties were often not the quality he expected, but also acknowledged that the quality of an accommodation is, in some sense, in the eye of the beholder, and that what qualifies as "nice" for others might not be nice for him and his wife. He also testified that he never complained about the accommodations to Wyndham and that the quality of the accommodations did not affect his ability to enjoy his vacation. Finally, Leake disavowed several claims contained in his complaint. He disavowed (1) that a Wyndham representative told them that a resort timeshare would be an investment; (2) that a Wyndham

7

Case 6:18-cv-03319-MDH   Document 88   Filed 12/16/19   Page 7 of 15

representative told him they could sell their timeshare at a profit; and (3) that a Wyndham representative told him maintenance fees would not increase.

## Standard of Review

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-249. Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

## Discussion

8

A breach of contract action has four elements: (1) the existence and terms of a contract; (2) that plaintiffs performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff. *Keveny v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (en banc). In this case, the counterclaim-defendants do not dispute the existence of the contracts, their breach of those contracts, or that Wyndham suffered economic losses as a result. They also do not allege that Wyndham violated the terms of the contracts. The sole disputed issue in this case is whether the contracts entered into between plaintiffs and Wyndham were invalid because of either (1) economic duress; or (2) material fraudulent misrepresentations made by Wyndham agents to induce the plaintiffs to sign the contract.

"To avoid a contract with a claim of economic duress the claimant must reveal oppression from the wrongful conduct of another that deprives them of free will." *Long's Marine, Inc. v. Boyland*, 899 S.W.2d 945 (Mo. App. 1995) (internal citations omitted). The question of whether economic duress exists is a question of law. *Id.* The central question with respect to duress is whether, considering all surrounding circumstances, "one party to the transaction was prevented from exercising his free will by threats or wrongful conduct of the other." *Andes v. Albano*, 853 S.W.2d 936, 942 (Mo. 1993) (en banc). Conduct cannot constitute duress unless it is wrongful, and it is not wrongful to do or threaten to do what one has a right to do. *Gustin v. F.D.I.C.*, 835 F.Supp. 503, 508 (W.D. Mo. 1993). Finally, "Silence and acquiescence for a considerable period after an agreement is allegedly executed under duress, action in accord with it, and acceptance of the benefits under it amount to a ratification of the agreement." *Slone v. Purina Mills, Inc.*, 927 S.W.2d 358, 371 (Mo. App. 1996) (citing *Schmalz v. Hardy Salt Co.*, 739 S.W.2d 765, 768 (Mo. App. 1987).

Fraudulent misrepresentation has nine elements: 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity or ignorance of its truth; 5) the speaker's intent that the representation should be acted upon by the hearer and in the manner reasonably contemplated; 6) the hearer's ignorance of the falsity of the representation; 7) the hearer's reliance on the representation being true; 8) the hearer's right to rely thereon; and 9) the hearer's consequent and proximate injury. *Emerick v. Mut. Ben. Life. Ins. Co.*, 756 S.W.2d 513, 519 (Mo. 1988) (en banc). It is established that "When fraudulent misrepresentations are alleged, a party . . . may disaffirm the contract . . . and sue for rescission." *Shaw v. Raymond*, 196 S.W.3d 655 (Mo. App. 2006) (quoting *Evergreen Nat'l Corp. v. Carr*, 129 S.W.3d 492, 496 (Mo. App. 2004).

### A. Defenses of Gay Hartfiel and Thomas Kohlbeck

After careful review of the facts in this case and the law, the Court finds Kohlbeck and Hartfiel's affirmative defenses fail. The Court notes that silence and acquiescence for a considerable period after an agreement allegedly executed under duress amounts to a ratification of the agreement even if it were executed under duress. *Slone*, 927 S.W.2d at 371. The facts show that the couple, after signing the agreement, abided by its terms and obtained its benefits for thirteen months without complaint. Only after Hartfiel's illness made it impossible to vacation as much as they had planned did the couple stop making their required monthly payments. Even assuming the couple were prevented from exercising their free will by threats or wrongful conduct at the time of signing, this long period of compliance with the contract constitutes ratification of its terms and is fatal to their economic duress claim under Missouri law.

The Court additionally notes that while the couple were no doubt subject to a high-pressure sales pitch on March 19, 2017, there is no evidence of a threat or any wrongful conduct that effectively prevented them from exercising their free will. Kohlbeck and Hartfiel were experienced

10

timeshare purchasers and users—by their own testimony, they had entered into at least six other timeshare contracts before March 19, 2017 and had in other cases "ripped up" proposed timeshare contracts and walked out. The evidence does not raise a genuine issue of material fact as to whether they were under duress when entering into the contract that is the subject of Wyndham's counterclaim.

The couple's fraudulent misrepresentation defense also fails. In deposition testimony, Kohlbeck conceded he was not misled by Wyndham and could not recall any specific misrepresentations by Wyndham representatives. Hartfiel does remember two specific misrepresentations: (1) That a Wyndham representative told them they could "rent out points" to other timeshare owners to make extra money to cover their maintenance fees; and (2) That a Wyndham representative had told her that Wyndham would assist her in renting out her timeshare properties for extra points. As to the first misrepresentation, Hartfiel conceded the couple never actually attempted to "rent out" any points to other timeshare owners to cover maintenance fees. Because the couple never attempted to take advantage of this promised benefit, the Court finds Hartfiel could not have suffered any damages from an alleged misrepresentation concerning that benefit.

As to the second misrepresentation, the Court considers it inadequate to support a claim of fraudulent misrepresentation. Hartfiel testified the couple never attempted to contact Wyndham to rent out her extra points in this manner. Because Hartfiel never attempted to gain extra points by renting out properties to other timeshare owners, the Court finds they did not suffer injuries as a to support a fraudulent misrepresentation claim. Even if the couple had sought and been denied Wyndham's help in generating extra points in this fashion, there is a total lack of evidence that they would not have entered into the contracts absent that representation. The Court notes the

11

couple were experienced timeshare-purchasers who did successfully convert their points into cash to cover maintenance fees on numerous occasions.

In their suggestions in opposition (Doc. 86), Hartfiel and Kohlbeck claim they were told that a medical hardship would allow them to cancel their obligations under the contract. In deposition testimony, the couple nowhere claim that representation was made at the time the contract was entered into or before. Because that alleged misrepresentation postdates the contract, it cannot be the basis for the contract's rescission. The Court also notes that Hartfiel confirmed she did not provide Wyndham the documents required under the contract to process her hardship claim. After careful review, the Court finds there to be no genuine issue of material fact as to whether Kohlbeck and Hartfiel can rescind their contracts for fraudulent misrepresentation.

### b. Defenses of Roger and Rita Leake

After careful review of the facts in this case and the law, the Court finds the Leake's affirmative defenses fail. As the Court noted above, silence and acquiescence for a considerable period after an agreement allegedly executed under duress amounts to a ratification of the agreement even if it were executed under duress. *Slone*, 927 S.W.2d at 371. In this case, the Leakes continued to use and enjoy the benefits of their 2013 timeshare contract for 5 years after signing it. This alone is fatal to their duress claim. Even if it were not, the record is devoid of evidence that the Leakes were subject to pressure or threats that prevented them from exercising their free will. The Leake's description of the May 2013 sales presentation is substantially identical to how they described Wyndham's prior sales presentations, and at no point do they describe a threat or any wrongful conduct. The Leakes were experienced timeshare purchasers and users who since 2001 had both entered into timeshare contracts and walked away from them after high-pressures sales

12

meetings. There is no genuine issue of material fact as to whether they were under duress when entering into the contract that is the subject of Wyndham's counterclaim.

The Leake's fraudulent misrepresentation defense also fails. Roger and Rita Leake effectively conceded in deposition that the alleged misrepresentations made by Wyndham in the May 2013 presentation boil down to two items: (1) That the quality of their accommodations was below what Wyndham promised; and (2) that they could not always secure their desired accommodations as Wyndham promised they would be able to. As to the first alleged misrepresentation, the Court finds that any perceived shortfall in quality did not cause injury to the Leakes. First, Roger Leake testified the lower-than-expected room quality did not affect their ability to enjoy their vacation. Second, although Rita Leake testified that some of the rooms were "shabby," she never complained to Wyndham and did not contradict her husband's testimony that the shabbiness of certain properties affected their enjoyment of them. The Leakes visited Wyndham properties approximately twenty times between 2001 and 2017 without a single complaint until the initiation of this lawsuit, which indicates to the Court they were generally satisfied with their accommodations.

As to Wyndham's second alleged misrepresentation, the Court notes that both Roger and Rita Leake testified they had been aware since 2005 that certain exotic Wyndham properties had to be booked far in advance. Rita Leake, who actually handled the booking, stated there were 5 or 10 times she was unable to book a resort on a certain date, but could not specifically name any resorts she tried and failed to book. Neither Rita Leake nor her husband ever complained to Wyndham about their inability to book properties.

After consideration of the above facts, the Court finds the Leakes cannot establish the sixth element of their fraudulent misrepresentation claim because they were not ignorant of the falsity

13

of the Wyndham Representative's representation in May 2013. Assuming Wyndham did in fact represent at the May 2013 sales presentation that entering into this timeshare contract would guarantee them the ability to book a timeshare at any location, it cannot be disputed that Rita Leake testified she was aware of identical representations by Wyndham and their falsity as early as 2005. As the Court noted above, the Leakes by 2013 were experienced timeshare users who knew how the reservation system worked. Because there is no genuine issue of material fact as to whether the Leake's knew of the falsity of Wyndham's representations concerning the availability of certain timeshares during certain parts of the year, the Leakes cannot rescind the contract on this basis. The Court also finds that even if they were ignorant as to the falsity of this claim, there is no evidence in the record indicating the Leakes relied on this particular representation when they signed the timeshare contract. After careful review, the Court finds there to be no genuine issue of material fact as to whether Roger and Rita Leake can rescind their contracts for fraudulent misrepresentation.

### C. Damages

Wyndham, having proven there is no genuine issue of material fact concerning plaintiffs breach of their timeshare contracts, is entitled to receive the benefits of its bargains. *Arcese v. Daniel Schmitt & Co.*, 504 S.W.3d 772, 783 (Mo. App. 2016) (internal citations omitted). The Court notes that because plaintiffs have defaulted on their timeshare contracts, Wyndham is entitled under the terms of the contracts to "declare the entire unpaid balance of Purchase price and Processing Fee immediately due and payable, unless prohibited by law" and to "sue for the unpaid balance due hereunder." As such, Wyndham is entitled to receive the entire unpaid loan balance, not merely the portion of that remaining balance currently due under the contracts' payment plan. Wyndham is also entitled to receive any unpaid maintenance fees.

## **CONCLUSION**

Plaintiffs do not dispute they entered into the contracts or the specific damage amounts asserted by Wyndham. Instead, they asserted the affirmative defenses of duress and fraudulent misrepresentation in an effort to avoid their contractual obligations. For the reasons stated above, these defenses fail. Because there is no genuine issue of material fact as to whether plaintiffs breached their contracts with Wyndham or whether those contracts may be voided for duress or rescinded for fraud, the Court hereby **GRANTS** Wyndham's Motion for Summary Judgment (Doc. 84) on its counterclaims and enters **JUDGMENT** against Thomas Kohlbeck and Gay Hartfiel on Count I of Wyndham's Counterclaim and against Rita Leake and Roger Leake on Count II of Wyndham's Counterclaim. Wyndham is **ORDERED** to file a motion for a specific damage amount to be determined and entered against defendants by December 30, 2019.

**IT IS SO ORDERED**.


DATED: December 16, 2019

                                                */s/ Douglas Harpool*
                                                **M. DOUGLAS HARPOOL**
                                                **UNITED STATES DISTRICT JUDGE**